**ASSOCIATION FOR DISABLED AMERICANS, et al.,**
**Plaintiffs,**

v.

**CITY OF ORLANDO, etc., Defendant.**

**No. 6:99CV1605ORL22KRS.**

United States District Court,
M.D. Florida,
Orlando Division.

July 30, 2001.

William Nicholas Charouhis, William N. Charouhis & Associates, P.A., Miami, FL, for plaintiffs.

Martha Lee Lombardy, Office of Legal Affairs, Orlando, FL, Cristina Arechaga, Moran & Shams, P.A., Orlando, FL, Christoper Charles Skambis, Jr., Skambis Law Firm, Orlando, FL, for Defendant.

### MEMORANDUM DECISION AND ORDER

CONWAY, District Judge.

### I. INTRODUCTION

Plaintiffs sue the City of Orlando ("the City"), seeking injunctive relief and alleging that the City is in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Plaintiffs allege that the Bob Carr Performing Arts Centre ("Bob Carr") and the Orlando Arena ("the Arena") are inaccessible to and unusable by individuals with disabilities.[1] Plaintiffs thus ask the Court to order the City to modify both facilities so as to make them accessible to disabled individuals.

Plaintiff, the Association for Disabled Americans ("the Association"), is a non-profit corporation whose membership is comprised of disabled individuals. The Association's stated purpose is to assure that public services and accommodations are available to its members, to assure that its members will not be discriminated against or excluded from participation in public services or accommodations, and to bring actions to enforce the ADA when necessary. Plaintiffs Kate Burn ("Burn") and Tracy Whiteley ("Whiteley") are the parents and representatives of disabled minors, Storm Burn, Christopher Whiteley, and Michael Whiteley. Plaintiffs Daniel Ruiz ("Ruiz") and Jorge Luis Rodriguez ("Rodriguez") are disabled individuals who are also members of the Association.

The Arena and Bob Carr were both constructed prior to the implementation of the ADA on January 26, 1992. Facilities completed prior to that date are not required to meet the stringent accessibility standards applied to facilities completed after the ADA was enacted.

This case was tried by the Court, without a jury, on June 25–27, 2001. Applying pertinent legal principles to the evidence presented, the Court determines that the Arena and Bob Carr, when viewed in their entirety, are accessible to and usable by individuals with disabilities.

### II. FINDINGS OF FACT[2]

Daniel Ruiz, Jorge Rodriguez, Storm Burn, Christopher Whiteley, and Michael Whiteley are residents of the State of Florida, and individuals with disabilities, as defined by the ADA. The City of Orlando owns and operates the Bob Carr Performing Arts Centre and the Orlando Arena.

---

1. The Orlando Arena is now known as the T.D. Waterhouse Centre. For the purpose of clarity, however, the Court will refer to "the Arena."

2. Some of the facts set forth in this section are derived from the "UNCONTESTED FACTS" section of the parties' Joint Pretrial Statement. *See* Doc. 97.

Bob Carr was built in 1928, and was substantially remodeled in 1978. Since then, Bob Carr has been renovated three times—the bathrooms and lobby were remodeled in 1992, additional wheelchair seating was created in 1993, and renovations were made to the theater in order to present "The Phantom of the Opera" in 1998. The Arena was built in 1988 and opened in 1989. The only significant modifications to the Arena occurred in 1994, when the seating was replaced, and in 2000, when the concession stands were renovated. Few details concerning those renovations were introduced as evidence at trial.

The Bob Carr theater seats approximately 2,400 patrons, and includes 27 wheelchair accessible seats. Six wheelchair seats are located near the front of the theater, with an additional 21 seats located in the rear of the theater, in five different configurations. The location of the wheelchair seating at the Arena depends on the event being presented. At games involving the Arena's primary tenant, the National Basketball Association's Orlando Magic, wheelchair seating is located on the concourse level, behind sections 104 – 120, and sections 109 – 115.

With one or two exceptions, the City does not present programs at either facility. Rather, the City allows various promoters and presenters to present programs at the City's facilities. The contracts between the City and the presenters require the presenters to comply with all state and federal laws, including the ADA. *See* Defendant's Trial Exhibits 35 and 46.

The sale of tickets to events at the Arena and Bob Carr is controlled largely by the contracts between the City and various presenters. The City is not primarily responsible for selling tickets to the events presented at either facility. However, some presenters release selected tickets to the City; those tickets are then sold to the public through the Ticketmaster service, and at the Bob Carr and Arena box offices. The City does not sell tickets over the phone, but makes an exception for disabled customers.

Collectively, Plaintiffs have visited the Arena and Bob Carr on numerous occasions. Rodriguez' first and only experience at Bob Carr took place when he and his family attended a dance recital at Bob Carr on June 24, 2001, the day before this trial began.[3] Whiteley and her sons attended an April 1998 performance of "The Phantom of the Opera" at Bob Carr. She and her sons also attended events at the Arena on two separate occasions. Ruiz attended no fewer than 10 events at the Arena, sometimes as a spectator, and occasionally as a competitor on a basketball team for disabled individuals. Burn and her son attended performances at Bob Carr several times a year, over a span of five to six years. They also attended a number of events at the Arena.

On December 19, 2000, Michael Brennan, a witness for the Plaintiffs, conducted an inspection of both facilities, pursuant to Rule 34 of the Federal Rules of Civil Pro-

---

3. At trial, counsel for the City moved to strike Rodriguez' testimony pertaining to his attendance of that event. Prior to that performance, Rodriguez had never attended an event at Bob Carr because he had been told that it was inaccessible to disabled individuals. The City argued that it was unfairly surprised by Rodriguez' testimony, and that it was prejudiced because his visit to Bob Carr took place after the close of discovery, and it had not had an opportunity to depose him regarding that visit. After reviewing his testimony, the Court has decided not to strike it, in light of the fact that it was substantially similar to the testimony of Tracy Whiteley, and did not significantly affect the outcome of the case.

cedure. Also present at the inspection were Ruiz, Whiteley, and counsel for both parties.

### III. PLAINTIFFS' ALLEGATIONS

Plaintiffs point to numerous examples of the City's alleged ADA violations at both the Arena and Bob Carr. A brief summary of their complaints and the testimony offered by both parties at trial follows below:

### A. Violations at Bob Carr

1. Wheelchair accessible seating—Bob Carr has six areas of wheelchair accessible seating. Row JJ contains 6 wheelchair spaces, and is located in the orchestra left section of the theater, approximately 11 rows from the stage. Twenty-one additional wheelchair spaces are located in the rear of the theater, in Rows W and Y. Each of the wheelchair spaces is 32 inches wide; the depth of each space varies from 70 inches to 108 inches, depending on the location of the seating.

Plaintiffs complain that the accessible seating areas lack clear paths of access, sufficient lines of sight, and clear paths of egress from the auditorium in the event of fire or other emergency. Plaintiffs also allege that the companion seats in these areas are folding chairs, rather than fixed seats. Additionally, Plaintiffs allege that the seats closest to the stage, those in Row JJ, are frequently occupied by able-bodied individuals and occasionally occupied by audio-visual equipment.

William Becker, the Director of the Orlando Centroplex, which operates both the Arena and Bob Carr, testified that the City renovated the seating in the theater in 1993 in order to create accessible seating in compliance with the ADA guidelines. He testified, however, that none of the seats in Bob Carr have raising armrests or pictograms on the seats.

2. Bar and food service counters— Becker testified that the City retains control over the concession counters at Bob Carr, and that they have not been modified since the ADA went into effect in order to comply with the relevant guidelines. Plaintiff Rodriguez testified that he could not use the counters when seated in his wheelchair, because they were too tall.

3. Restrooms—Rodriguez testified that he did not attempt to use the restroom at Bob Carr once he realized that he would be unable to wash his hands because cabinets blocked his access to the sinks. Rodriguez explained that the cabinets prevented him from pulling his wheelchair close enough to the sink to wash his hands. On cross-examination, however, it became clear that Rodriguez did not attempt to use the accessible stall located inside the restroom, and, therefore, could not testify as to whether he could have used the sink inside that stall.

Whiteley testified that her sons' wheelchairs also would not be able to fit underneath the sink counters in the men's restrooms. However, she acknowledged on cross-examination that not all of the sinks in the building have counters underneath them, and that the sinks in the accessible stalls were unobstructed.

Whiteley testified that, in order to use the attendant restrooms, her son and his nurse had to exit the theater, take an elevator down to the ground level, exit the building, travel down a ramp, and enter the side doors to the building. However, ushers do not allow the side doors to be opened while a performance is in progress.

Brennan testified that the grab bars in several of the restrooms appeared to have been moved since his pre-litigation visit to Bob Carr.[4] He also testified that the mir-

---

4. Brennan did not, however, testify as to whether the grab bars had been moved to a more beneficial height for disabled individu-

als or whether the bars, in their new location, complied with the guidelines.

rors in the men's restrooms were placed too high, the doors did not have sufficient offsets, the toilet paper dispensers were mounted too close to the grab bars in the accessible stalls, and the restrooms lacked signage informing patrons that the restrooms were accessible.

On cross-examination, Brennan acknowledged that the disabled stalls in the restrooms had unobstructed sinks and mirrors that wheelchair users could see themselves in.

4. Water fountains—Whiteley testified that the water fountains were mounted too high for her sons to use them. Brennan testified that the water fountain on the second floor was mounted 39 inches above the finished floor, and that it could not be used by individuals with limited manual dexterity because the button operating the fountain was located on top of the spout. No evidence was presented as when the water fountains were installed or whether they had been replaced since the ADA was enacted.

5. Egress—Whiteley and Brennan testified that the means of egress from the rear seating areas were insufficient. Whiteley testified that, in order for one of her sons to exit the accessible seating area, she had to move her other son's chair out of the way. Whiteley also testified that the only way for wheelchair-bound patrons to exit the theater from the rear seating area is to use the elevator, which is often filled by able-bodied patrons following a performance.

Becker testified that the City hires an Orlando fire fighter at each performance, whose is responsible for assisting disabled patrons in the event of a fire or other emergency. Whiteley and Rodriguez both testified that they could not remember seeing a fire fighter when they were at Bob Carr.

6. Stairways—Brennan testified that the handrails on the stairs did not extend past the top or bottom of the stairs.

7. Tables—Brennan, Whiteley, and Rodriguez each testified that the tables in the lobby had barriers underneath them that made it impossible for wheelchair-bound individuals to pull all the way underneath them.

### B. Violations at the Arena

1. Wheelchair accessible seating—Becker, the Director of Centroplex, testified that the Arena's primary tenant, the Orlando Magic, does not permit wheelchair seating on the floor. Wheelchair seating at Magic games is, therefore, confined to the concourse level, behind sections 104 – 120, and 109 – 115 in the lower bowl. Plaintiffs complain that these seats offer poor lines of sight at Magic games, particularly when fans are standing. Ruiz also testified that he was never informed that wheelchair patrons can purchase tickets at any price level and still be seated in the wheelchair accessible seating area. The City permits people to sit in that higher priced area regardless of the actual price paid for their tickets.

Becker testified that when the original seating was installed in the Arena, city codes limited the number of seats that the Arena could contain. However, in 1994, the City was allowed to add more seats to the Arena. The City replaced all the seats in the Arena at that time, at the Magic's request. At trial, the City introduced as evidence showing that on May 24, 1993, the City suggested to the Magic that the renovations would be a good opportunity for the Magic to remedy the lack of accessible seating at games. *See* Defendant's Trial Exhibit 34.

Becker further testified that, when different events are presented at the Arena, the presenters decide how they want the seats laid out, within the City's parame-

ters, and those layouts are approved by the Fire Marshal. At most events other than Magic games, the City's seating layouts reserve an area for disabled seating on the floor of the Arena. Becker also testified that Arena ushers make every effort to accommodate disabled individuals when the disabled seating sections are full. At Magic games, any disabled individual with a ticket may sit in the disabled seating section, regardless of where his or her original seat was located.

In 1994, the City received a letter from the Paralyzed Veterans Association complaining that the disabled seating area at Magic games had poor lines of sight, particularly when fans were standing. Since that time, the City has experimented with using risers at Magic games so disabled individuals can see better. However, Becker testified that the risers were taking up too much space, leaving little room for patrons to enter, exit, and walk around the inside of the Arena. The City and the Magic are still trying to find a solution for this problem. For non-Magic events, the City has addressed the problem by not selling tickets in the last two rows of seats in front of the accessible seating. The Magic currently sell those seats to season ticket holders.

2. Skyboxes—Whiteley and Ruiz attested to the general inaccessibility of the skyboxes at the Arena. Both testified that patrons in wheelchairs are unable to sit in the front of the skyboxes because they contain counters that act as barriers, and seating which is bolted to the floor and cannot be moved. Consequently, Plaintiffs complain that visibility in the skyboxes is poor for individuals in wheelchairs.

Plaintiffs also complained that the restrooms inside the boxes are not wide enough or deep enough to accommodate individuals in wheelchairs. Public restrooms are located in each corner of the skybox level, but Brennan testified that those restrooms pose difficulties as well. First, they lack appropriate signage. Second, Brennan testified that an individual with poor manual dexterity, such as himself, would be unable to operate the sinks in those restrooms because the faucets do not have proper controls. Lastly, Brennan testified that there was too great a distance between the toilet and the grab bars on the wall, which would make it difficult, if not impossible, for a disabled individual to transfer from a chair to the toilet. Whiteley testified, however, that her sons were able to use those restrooms successfully when she assisted them

Becker testified that the Magic own the skyboxes, and are therefore responsible for selling them and building them out, although the City has the ability to make repairs to the boxes as a result of normal wear and tear. Most of the boxes were completed by the time the Magic started playing games in November of 1989. The City itself leases two skyboxes, one of which is used by the City, and one of which is used by the County. Becker testified that neither of those boxes has been modified since they were built.

3. Concession stands—Becker testified that the City had renovated the concession stands in the past year as a result of health department policies. Pizza ovens were installed and the counter tops were re-covered with new formica. Plaintiffs complain that the counter tops in the concession stands are too high for wheelchair patrons to reach them.

Becker testified that the counters are part of the structural design of the Arena, in that the Arena's return air ducts are located underneath the counters. Becker also testified that ushers have been instructed to assist disabled patrons in obtaining concessions.

4. Parking—Brennan testified that the accessible parking spaces on the street

near the Arena do not have enough space for access to a lift. He further testified that spaces in the Centroplex parking garage do not have access aisles, and that he would not be able to exit his van if a car was parked next to his parking space. Brennan also testified that the accessible parking spaces near the Arena box office are not properly demarcated.

On cross-examination, Brennan said that he would be able to use a parking space with a total width of 16 feet, the total amount of space required by the ADAAG and UFAS guidelines. Upon his inspection, he measured the width of a Bob Carr parking space to be 11 feet wide, with a 78 inch (6.5 feet) wide access aisle.

Becker testified that the City has exclusive control of the parking around the Arena.

5. Elevators—Plaintiffs complain that the elevators lack audible indicators, and that the emergency call box in the elevators cannot be opened by individuals with poor manual dexterity. However, Becker testified that the elevators are operated by attendants when the Arena is in use.

5. Additional complaints—Plaintiffs also allege that: the drinking fountains on the concourse level are mounted too high above the floor; there is inadequate signage informing patrons of accessible entrances and accessible restrooms; the ATM lacks instructions in Braille; the ramp outside the Arena is too steep and lacks adequate hand rails; the phone banks do not have shelves on which teletype telephones for the deaf can be used; there are an insufficient number of assisted listening devices; and the emergency strobe indicators are mounted in the ceiling, making them difficult for some disabled patrons to see them.

## IV. APPLICABLE LAW: TITLE II OF THE ADA

In 1992, Congress passed the ADA in an effort to address discrimination against disabled individuals. The ADA thus prohibits discrimination in employment (Title I), public services and transportation (Title II), public accommodations (Title III), and telecommunications (Title IV). Title II, which is the basis of this action, provides:

no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

42 U.S.C. § 12132.

The statutory language of the ADA gives the Attorney General the power to promulgate regulations implementing Title II. *See* 42 U.S.C. § 12134(a). Included in the regulations are accessibility guidelines that articulate the minimum technical requirements for ADA compliance for new construction or alterations to existing facilities. *See* 28 C.F.R. Ch. 1, Pt. 36, App. A. These guidelines are known as the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG). Another set of standards is used for buildings built with federal funds. These are known as the Uniform Federal Accessibility Standards (UFAS). *See* 41 C.F.R., Pt. 101–19.6, App. A. Public entities subject to Title II may comply with either set of standards. *See* 28 C.F.R. § 35.151.

The regulations also distinguish the accessibility requirements for facilities built prior to the ADA's implementation date ("existing facilities"), and facilities built or altered after that date. With respect to existing facilities:

public entities are not required to modify each facility to provide for access by

individuals with disabilities, but must operate all programs, services and activities in a manner such that, when viewed in its entirety, each service or program is "readily accessible to and usable by individuals with disabilities . . ."

*Kinney v. Yerusalim*, 812 F.Supp. 547, 548 (E.D.Pa.1993) (quoting 28 C.F.R. § 35.150(a)). A heightened standard is applied to facilities altered after the ADA's implementation date. The regulations require that:

> each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such a manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities if the alteration was commenced after January 26, 1992.

28 C.F.R. § 35.151(b).

## V. ANALYSIS

The Court's task in determining whether the Arena and Bob Carr are in violation of Title II is a difficult one. Curiously, for a statute that has had such a profound impact on both the law and the lives of disabled individuals, there is a conspicuous lack of case law interpreting the scope and limits of Title II. There have been, however, a couple of cases addressing the accessibility requirements for multi-purpose arenas. In a case involving the Rose Garden Arena in Portland, Oregon, the court ordered the arena to bring several aspects of the facility into compliance with the ADAAG guidelines, to change the configuration of its accessible seating, and to modify some of its ticket sale policies with respect to accessible seating. *See Independent Living Resources v. Oregon Arena Corp.*, 982 F.Supp. 698 (D.Or.1997), *related reference* 1 F.Supp.2d 1124 (D.Or. 1998), and *opinion supplemented* 1

F.Supp.2d 1159 (D.Or.1998). In another case against the architects and owners of the MCI Center in Washington, D.C., the district court ruled that substantially all wheelchair seating had to have lines of sight over standing spectators. *See Paralyzed Veterans of America v. Ellerbe Becket Architects & Engineers*, 950 F.Supp. 389 (D.D.C.1996), *aff'd* 117 F.3d 579 (D.C.Cir. 1997). Though these cases involved arenas, the Court does not believe that they are instructive in the instant case, primarily because both the Rose Garden and the MCI Center were built after the ADA was enacted. Because those facilities were required to meet a more stringent standard of accessibility than either the Arena or Bob Carr, the Court does not believe that similar analyses can be applied to the instant case. The Court must, therefore, chart its own course in determining the accessibility of the facilities at issue.

■ As a preliminary matter, the City maintains that it merely owns and operates the Arena and Bob Carr, and that the selling of tickets, configuration of seating, and programs presented at both facilities are under the control of the various presenters who contract with the City. It is true that the City appears to have little control over the programs presented at the facilities. This fact does not, however, immunize the City from suit under Title II of the ADA. Several courts have held that "a public entity, leasing or renting out its facilities to non-public entities, is subject to Title II of the ADA because it is considered to be a landlord." *Levy v. Mote*, 104 F.Supp.2d 538, 543 (D.Md.2000); *Johnson v. Saline*, 151 F.3d 564, 571 (6th Cir.1998). Therefore, the fact that the City contracts with various presenters and promoters, but does not present programs itself is irrelevant. Because the City acts as a landlord of sorts, it may be held liable for potential ADA violations at either facility. The City has recognized this responsibility by including non-discrimination language

in its lease agreements, and in its correspondence with the Orlando Magic. *See* Defendant's Trial Exhibit 34.

This preliminary matter aside, the Court now turns to the issue of whether any such violations exist.

### A. Existing vs. Altered Facilities

Because the Arena and Bob Carr were built prior to the enactment of the ADA, they are "existing facilities," as defined by the regulations. The facilities are, therefore, not required to meet the stringent accessibility standards applied to new construction. Plaintiffs argue, however, that because certain elements of both facilities have been altered, an obligation to make the facilities fully accessible was triggered.

The heightened accessibility requirements for altered facilities are triggered when an alteration "affects or could affect the *usability* of a facility." 28 C.F.R. § 35.151(b) (emphasis added). Thus, a public entity that undertakes alterations that affect the usability of existing facilities must take that opportunity to make the facilities accessible. At trial, evidence was presented that alterations have been made to both facilities since 1992. The issue for the Court, therefore, is whether those alterations triggered any obligations to make the facilities accessible.

With regard to Bob Carr, it appears that all of the alterations made to the public areas of the building since 1992 were made in an effort to make the building more accessible to disabled individuals. Mr. Becker testified that the restrooms were renovated to add accessible stalls in 1992. In 1993, the seating in the theater was modified to increase the number of wheelchair accessible seats. In 1994, an additional accessible restroom was added adjacent to Row JJ of the theater. Each of these alterations appears to have affected the "usability" of the theater; however, the end result of those alterations was to make the facilities more accessible to disabled individuals. To the extent that an obligation to make the facilities more accessible was triggered by those alterations, the Court finds that the obligation was met.

With respect to the Arena, Becker testified that the only extensive alteration made to publicly accessible areas of the Arena was the replacement and addition of seats in the upper and lower bowls. That change was made at the Magic's request, in order to increase the seating capacity of the Arena. Though the replacement of the seats was arguably an alteration affecting the usability of the Arena, the Court does not believe that it presented an opportunity to add or modify accessible seating. The presence of stairs in both the upper and lower bowls of the Arena would seemingly make it impossible for individuals in wheelchairs to sit in those areas. Because Plaintiffs did not present expert testimony at trial, the Court has no way of knowing whether modification to those areas was even structurally possible. It appears, however, that the stepped nature of the Arena makes the dispersal of accessible seating "technically infeasible." *See* 28 C.F.R., Pt. 36, App. A. § 4.1.6(1)(j). It is, therefore, permissible for the accessible seating areas to be clustered, as they are in the Arena. *See* 28 C.F.R., Pt. 36, App. A. § 4.1.6(3)(f).

Plaintiffs argue that the poor lines of sight in the Arena could be remedied if the City would allow wheelchair seating on the floor of the Arena. Mr. Becker testified that such seating is offered at non-NBA events. The Magic, however, do not permit wheelchair seating on the floor. Plaintiffs presented no evidence that other arenas provide accessible seating on the floor at NBA games. Indeed, Ruiz testified that he has never sat on the floor at Miami Heat games, even though that team plays in a new arena that was opened in 2000,

and is, therefore, required to be fully accessible to disabled individuals. Consequently, the Court has no basis for requiring that accessible seating be permitted on the floor at Magic games.

Testimony was also presented that the concession stands at the Arena were modified when pizza ovens were installed and the counter tops were re-covered with new formica in 2000. Plaintiffs presented no evidence from which the Court could conclude that these renovations triggered a duty to bring the concession stands into compliance with the ADA guidelines. The installation of the pizza ovens did not affect patrons' usability of the concession stands, and the replacement of the formica on the counter tops was such a minor alteration that it did not significantly affect the usability of the counters.

The Court concludes that Plaintiffs have not met their burden of showing that the alterations at either facility triggered the City's obligation to make the facilities fully accessible. Consequently, the Court determines that the only standards applicable to this case are those pertaining to existing facilities. The issue for the Court, therefore, is whether the Arena and Bob Carr are accessible to individuals with disabilities "when viewed in their entirety."

### B. Program Accessibility

■ The City acknowledges that certain individual elements of the Arena and Bob Carr do not meet the stringent technical specifications of the UFAS and ADAAG guidelines. The City argues, however, that, because both facilities were built prior to the implementation of the ADA, strict compliance with the guidelines is not required. On this point, the City is correct. Because the facilities are "existing facilities," they are held to a much lower standard of accessibility, which is met if the programs presented at the facilities are readily accessible to disabled individuals.

The Court must, thus, focus on the concept of "program accessibility" rather than "facilities accessibility." *See Parker v. Universidad de Puerto Rico,* 225 F.3d 1, *5 (1st Cir.2000). Under the "program accessibility" standard, the Court must determine whether the Arena and Bob Carr, "when viewed in their entirety," are readily accessible to disabled patrons. *See* 28 C.F.R. § 35.150. In doing so, the Court must "look at the accessibility of the [facilities] as a whole, not at individual elements." *Pascuiti v. New York Yankees,* 87 F.Supp.2d 221, 223 (S.D.N.Y.1999).

■ When the Arena and Bob Carr are viewed as a whole, it is clear that both facilities are readily accessible to disabled patrons. Each of the Plaintiffs testified that they had no significant difficulty entering either of the facilities. Rodriguez testified that he was able to successfully enter Bob Carr when he attended a performance there. Whiteley testified that she and her husband had no problems getting their sons into either the Arena or Bob Carr when they visited each facility. Ruiz testified that he once experienced some difficulty finding the Arena's accessible entrance from his parking spot (which was not in one of the accessible lots), but that he did not have difficulty actually entering the Arena.

Additionally, Brennan testified that on the date of his pre-litigation visit to the Arena and Bob Carr, he gained entry into both facilities without assistance. It is worth noting that his visit took place on a day when there were no events scheduled at either facility. Testimony was presented at trial that employees are always present to assist patrons when the facilities are in use. Based on the testimony, the Court determines that there are no significant barriers that prevent disabled individuals from entering either the Arena or Bob Carr.

Once inside the facilities, it does not appear that disabled individuals are prevented from participating in or watching the programs presented in either facility. Neither facility presents the optimal or most comfortable experience for the Plaintiffs, but that does not preclude Plaintiffs from attending events at the facilities if they so desire. Plaintiffs have identified several elements at each facility that pose difficulties for individuals in wheelchairs. There is no question that these difficulties inconvenience disabled individuals to varying extents. However, none of them are so severe that they effectively prevent disabled individuals from attending games, performances or events at the Arena or Bob Carr. By that standard, the Court finds that the facilities meet the requirements of program accessibility and are accessible to disabled individuals.

### C. Title II Violations

■ Having determined that the Arena and Bob Carr are, indeed, accessible facilities, the Court turns to the issue of whether the City violated Title II by discriminating against Plaintiffs. Plaintiffs alleging discrimination in violation of the ADA bear the burden of establishing a *prima facie* case. *Williamson v. International Paper Co.*, 85 F.Supp.2d 1184, 1188 (S.D.Ala.2000). In order to establish a *prima facie* case, Plaintiffs must show: (1) that they are qualified individuals with disabilities; (2) that they were either excluded from participation in or denied the benefits of a public entity's services, programs, or activities; and (3) that such exclusion or discrimination was because of their disabilities. *See Parker*, 225 F.3d at *5. A "qualified individual with a disability" is defined as an "individual with a disability who, with or without reasonable modifications ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The Court finds that Plaintiffs Rodriguez and Ruiz are qualified individuals with disabilities, as are the minor children, Storm Burn, Christopher Whiteley, and Michael Whiteley.

The next inquiry, then, is whether the Plaintiffs were excluded from participation in, or denied the benefits of the City's programs, services, or activities. Each of the Plaintiffs testified that, not only were they able to gain entry into the Arena and Bob Carr with few problems, but once there, they generally enjoyed the performances they saw. Nevertheless, Plaintiffs each testified that they would be unlikely to return to the facilities in the future if they were not made fully accessible in compliance with the accessibility guidelines. Plaintiffs' reluctance to patronize the facilities in the future is unfortunate; however, the Court must not confuse a conscious decision not to attend events at the facilities with a denial of access to those events. In other words, the fact that Plaintiffs *choose* not to return to the Arena or Bob Carr in the future does not mean that the facilities are inaccessible to disabled individuals, or that they are being excluded from the facilities. Indeed, Plaintiffs presented no evidence at trial that they were excluded in any way from attending or participating in events presented at either facility.

There is no doubt that a number of elements of both facilities fail to meet the technical specifications required of new construction. If the facilities had been constructed after January 26, 1992, many of those elements would constitute ADA violations. Because the facilities were built prior to that date, however, the Court cannot now order that every aspect of the facilities be brought into technical compliance with those technical specifications. Because Plaintiffs have not proven that the non-compliant aspects of the Arena or Bob

Carr exclude them from attending the programs there, the Court determines that the City has not violated Title II, and that Plaintiffs are not entitled to an injunction.

### VI. CONCLUSION

After careful consideration, the Court has determined that both the Arena and Bob Carr, *when viewed in their entirety,* are accessible to and usable by disabled individuals. Title II, the regulations implementing it, and the (admittedly sparse) case law interpreting it, do not require that facilities built prior to 1992 comply with the stringent technical standards imposed on facilities built after 1992. Consequently, the Court cannot use those standards to determine whether the facilities are accessible. Although many of the issues raised by the Plaintiffs would appear to be easily remedied, the Plaintiffs' testimony established that they were able to access the facilities and attend the performances and events presented there. That fact, in itself, indicates at least a minimum level of accessibility.

Furthermore, Leland Brown, the City's ADA Coordinator testified that since he had taken that job in 1999, he was aware of only two complaints about the facilities—the complaint from the Paralyzed Veterans Association about the Arena's sight lines, and a customer service complaint from a group of individuals. Becker testified that the City has had a written policy since 1992 regarding accommodation of disabled individuals. The City also has a training program for both its employees and the employees of companies with whom it contracts to provide services at the Centroplex. Among the training at those sessions is training in how to assist disabled individuals. *See* Defendant's Trial Exhibit 22. The City has also created a "frequently asked questions" brochure for individuals buying disabled tickets at Centroplex facilities. *See* Defendant's Trial Exhibit 9. All of these actions are evidence that the City has made an effort to make the programs presented at its facilities accessible to disabled individuals.

The Court does not turn a blind eye to the fact that certain aspects of the facilities pose difficulties for the Plaintiffs. The question before the Court, however, is not *should* the City make the facilities more accessible, but rather, whether the law requires that it *must* make the facilities more accessible. In making this determination, the Court is required to view the programs presented at the facilities in their entirety, rather than focusing on specific inaccessible aspects of the facilities. By that standard, the Court can only conclude that the facilities are accessible.

Based on the foregoing, it is ORDERED that:

1. Plaintiffs' request for an order requiring the City to renovate the Arena and Bob Carr must be **DENIED.**

2. This case is **DISMISSED.**

3. The Clerk is directed to enter judgment in favor the Defendant, the City of Orlando, in accordance with this Order, and shall thereafter close this file.