# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**07-1182**

**MACLAFF, INC. ET AL.**

**VERSUS**

**ARCH INS. CO., ET AL.**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20031039
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

**********

**ULYSSES GENE THIBODEAUX
CHIEF JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Jimmie C. Peters, Judges.

**PETERS, J., DISSENTS, FINDING THAT THERE EXISTS GENUINE ISSUES OF MATERIAL FACT REQUIRING A TRIAL ON THE MERITS.**

**AFFIRMED.**

James L. Pates, Jr.
Robert Edwin Torian
LaBorde & Neuner
P. O. Drawer 52828
Lafayette, LA 70505
Telephone: (337) 237-7000
COUNSEL FOR:
     Defendants/Appellees - Liberty Surplus Insurance Corporation and
     RMS Insurance Brokerage, LLC

Charles P. Carriere
8200 Hampton - Suite 207
New Orleans, LA 70118
Telephone: (504) 865-7300
COUNSEL FOR:
     Defendants/Appellees - Utica Mutual Insurance Co. and Wright &
     Percy Insurance, Inc.

**Nancy J. Marshall**
**Ashley E. Gilbert**
**Ambrose Victor McCall**
**Anne B. Rappold**
**Deutsch, Kerrigan & Stiles, LLP**
**755 Magazine Street**
**New Orleans, LA 70130-3672**
**Telephone: (504) 581-5141**
**COUNSEL FOR:**
     **Defendant/Appellee - Arch Insurance Company**

**Patrick M. Wartelle**
**Leake & Anderson, L.L.P.**
**P. O. Drawer Z**
**Lafayette, LA 70502**
**Telephone: (337) 233-7430**
**COUNSEL FOR:**
     **Plaintiffs/Appellants - MaClaff, Inc., University Partnership, Ambassador Partnership, Abnar, Inc., Wilburn Enterprises, LLC, and Terry Wilburn d/b/a Cat Enterprises**

**THIBODEAUX, Chief Judge.**

Plaintiffs-appellants, MaClaff, Inc., University Partnership, Ambassador Partnership, Abnar, Inc., Wilburn Enterprises, L.L.C., and Terry Wilburn d/b/a Cat Enterprises (collectively referred to as "franchisees"), appeal the trial court's grant of a partial summary judgment in favor of defendant-appellee, Arch Insurance Company (Arch). The franchisees seek a reversal of that judgment, which found that their property and casualty insurance policy's wind deductible of "2% of Total Insured Value for Named Storm" applied to their claims. For the following reasons, the judgment of the trial court is affirmed.

I.

## ISSUES

1. Was summary judgment erroneously granted since the franchisees did not receive the policy disclosing the full terms of the named storm wind deductible until after their losses occurred?

2. Was the summary judgment erroneous because the Executive Summary of the Arch policy allegedly ambiguously disclosed the named storm wind deductible?

3. Was the summary judgment erroneous because RMS, as an agent of Arch, allegedly negligently misrepresented the terms of the named storm wind deductible to the franchisees?

4. Did the trial court legally err in finding that "total insured value" included both the value of the franchisees' interest in their properties, as well as the McDonald's Corporation's interest in each property?

## II.

## **FACTUAL BACKGROUND**

Plaintiffs-appellants are all McDonald's Corporation (McDonald's) franchise owners/operators of fast-food restaurants that are located in Jennings, Eunice, Oakdale, Kinder, the Morgan City area, and the Lafayette area. When Hurricane Lili struck parts of southern Louisiana on October 3, 2002, the franchisees suffered losses at their respective locations, namely, damage to signs, food spoilage, and lost revenue. At the time, the franchisees had in effect an Executive Summary of a policy issued by Arch, providing casualty and property insurance coverage.

The franchisees' insurance agent who helped procure this coverage was Larry Andrews, an insurance agent for Wright & Percy Insurance Agency (Wright & Percy) who was designated therein as "McDonald's Insurance Consultant." Mr. Andrews consulted with RMS Insurance Brokerage, L.L.C., (RMS), specifically with, owner, Diana Krause, to obtain a new policy with terms that would meet McDonald's franchise insurance requirements. He asked that she assist in obtaining coverage that mirrored, as closely as possible, the franchisees' then-existing policy with Zurich American Insurance Company (Zurich) that was expiring on October 1, 2002. Ms. Krause was provided with a copy of the Zurich policy to use as a reference and was advised that the new policy needed to be effective as of October 1, 2002.

Ms. Krause shopped for coverages with multiple insurers and was ultimately able to obtain coverage for the franchisees through Arch. Arch was an insurer, newly-approved by McDonald's to provide insurance to its franchise owners/operators through the McDonald's National Franchise Property Program. This program made available to franchise owners/operators the opportunity to contract with McDonald's-approved insurers for necessary coverages.

2

Ms. Krause began negotiating the terms of the new Arch policy with Arch Senior Vice-President of Underwriting, Nathan Warde. Mr. Warde had primary responsibility for the underwriting decisions and issuance of the Arch policy. In early September 2002—facing the September 30, 2002, expiration of the franchisees' existing policy—an Executive Summary of the proposed policy was drafted by RMS although the actual policy was not yet complete. On September 12, 2002, Ms. Krause provided Mr. Andrews with this Executive Summary, which he, in turn, provided to the franchisees with their respective premium quotes, for consideration. The one-page Executive Summary listed the categories of coverage to be provided by the policy, the applicable coverage limits, and deductible amounts. Pertinent to this case are the deductibles that were set forth in the Executive Summary as follows: Sign Deductible–$1,000; Food Spoilage Deductible–$1,000; Business Interruption Deductible–$1,000; and Wind Deductible–"2% Total Insured Value for Named Storm" (named storm wind deductible). At the bottom of the page, the Executive Summary stated "[t]he coverages shown are only intended to summarize the basic policy coverages and optional coverages. All coverage is subject to declarations, terms, conditions, and exclusions of the actual policy."

All of the franchisees accepted the provisions of the Executive Summary without reviewing a completed policy. They all relied on the information set forth in the Executive Summary and the oral information provided to them by Mr. Andrews about the policy's terms, particularly the named storm wind deductible and the meaning of "total insured value" as stated therein. According to the franchisees, although they had a wind storm deductible in their prior policy, it applied to their total losses and not the "total insured value" as the Arch policy proposed. It is undisputed that the franchisees were orally assured by Mr. Andrews that the named

3

storm wind deductible would be calculated based on their *total losses* just as their last policy had, despite the specific language of the Executive Summary. The franchisees all accepted the Executive Summary. They each signified their acceptance by signing a "McDonald's Corporate Approved Package Insurance Proposal for Policy Term 10/01/02-03" and returning it, with their respective premium deposits to Mr. Andrews on September 26, 2002, and September 27, 2002, days before their existing policy was due to expire. Each proposal contained the express declaration, "[p]lease bind my coverage eff. 10/01/02."

The franchisees' coverage for the one-year period beginning October 1, 2002, was confirmed on October 14, 2002, when Arch delivered its Confirmation of Binding (binder) to Ms. Krause at RMS. She, in turn, delivered this binder to Mr. Andrews at Wright & Percy. Arch's binder not only confirmed coverage of the subject properties as of October 1, 2002, but it also listed the policy's coverages and deductibles, including disclosure of a $25,000 minimum deductible for named storm wind claims:

**Deductible(s):**

. . . .

2%      of the total insurable values at risk at place and time of loss, subject to $25,000 minimum per occurrence as respects the peril of "Named Storm."

This $25,000 minimum had not been expressly disclosed on the Executive Summary that had been prepared by RMS and provided to the franchisees. However, the dispute that gave rise to this litigation did not arise at this time. It arose after the franchisees' filed claims for their respective losses due to Hurricane Lili. They claimed they learned, then, for the first time that the named storm wind deductible would apply to their losses, superceding the policy's other $1,000

4

deductibles, because their damages were caused by a National Oceanic and Atmospheric Administration (NOAA) "named" hurricane. In addition, they claimed to have learned for the first time that their deductible for their claims would be $25,000, based on the average total insured value of $1,250,000, that had been assessed for each property. Arch asserted that this value constituted the average total insured value McDonald's placed on each franchise location at the time. It included McDonald's ownership interest in each property as well as the individual franchisee's ownership interest.

Arch contended that the deductible was applied in accordance with the policy language set forth in Endorsement 4 that was issued with the actual policy in February 2003. The applicable portion of the endorsement states:

**DEDUCTIBLE(S)**

$1,000      Per Occurrence applies to all coverages; except,

. . . .

2%          of the combined "Total Insurable Values" for Building, Personal Property and Business Income at risk at place and time of loss, subject to $25,000 minimum per occurrence due to loss or damage from "Named Storm". A Named Storm is a windstorm or tropical disturbance that has been named by the National Weather Service. The deductible applies separately to each insured premises and to each Named Storm occurrence. We will then pay the amount of loss or damage in excess of the deductible, up to the applicable Limits of Insurance. ["]Total Insurable Values" means the 100% value of Building, Personal Property, and Business Income insured (using the applicable policy valuation clause) without regard to the Limit of Insurance.

The franchisees filed suit[1] against Arch, RMS, and Wright & Percy, claiming that the Executive Summary represented that the $1,000 deductibles for sign damage, food spoilage, and lost profits would apply in instances of these specific losses. Alternatively, they pled that if the named storm wind deductible was found to be applicable instead, that Wright & Percy, RMS, and/or Arch was liable for negligent misrepresentations made orally and/or in the Executive Summary of the Arch policy. They also pled that if the named storm wind deductible was found to be applicable, it should be applied solely to the value of their individual interests in the properties, excluding any value held by McDonald's in the properties. They asserted that, otherwise, the deductible would render the property insurances practically nonexistent, which would be against public policy. Finally, the suit claimed that Arch had arbitrarily and capriciously failed to tender payment of their claims after receiving satisfactory proof of their losses, triggering penalties and attorneys' fees pursuant to La.R.S. 22:658, which penalizes insurers for their untimely tender of payments.

Cross-motions for summary judgment were filed by the parties. At issue in this appeal is the trial court's grant of Arch's motion for partial summary judgment. The motion for summary judgment filed by Arch sought a judgment as a matter of law that would find that:

> [T]here is no genuine issue of material fact as to the applicability of the deductible for named storms under its policy no. 32 ESP 1271200 of 2% of the total insured value, with the minimum deductible of $25,000, and as to the fact that (1) the Executive Summary of the policy provisions was provided to plaintiffs through their agent, Wright & Percy, prior to the storm; (2) the Executive Summary was never modified by Arch or its agent, RMS;

---

[1]The franchisees later filed First and Second Supplemental and Amending Petitions, adding RMS's insurer, Liberty Surplus Insurance Company (Liberty), as a defendant and asserting claims of breach of fiduciary duty against RMS and Liberty.

and, (3) the Executive Summary provided for a named wind storm deductible of 2% of the TIV (total insured value), with a minimum $25,000 deductible. . . ."

The partial summary judgment rendered by the trial court states only that there is no genuine issue as to the material fact that the franchisees' losses "arising out of Hurricane Lili are subject to a deductible of the Total Insured Value, with the exception of the service interruption claims, which have a deductible of $1,000."[2] The franchisees have appealed this partial summary judgment, claiming that the trial court erred in finding that the named storm wind deductible applied for the following reasons: 1) the policy was not timely delivered to them, and the only document setting forth the deductibles prior to their losses was the Executive Summary, which was ambiguous; 2) the evidence showed that Arch was liable for its agent, RMS's, negligent misrepresentations about the application of the named storm wind deductible; and 3) the trial court legally erred in finding that "total insured value" as referred to in the named storm wind deductible, included the McDonald's Corporation's interest in each property.

III.

## LAW AND ANALYSIS

### Standard of Review

Appellate courts review summary judgments de novo, applying the same criteria that govern a trial court's determination of a motion for summary judgment. *Douglass v. Easton,* 953 So.2d 157 (La.App. 3 Cir. 3/7/07), *writ denied*, 07-650 (La. 5/11/07), 955 So.2d 1282 (citations omitted). Louisiana's Code of Civil Procedure states that summary judgment "shall be rendered forthwith if the pleadings,

---

[2]The issue of the applicable deductible for the service interruption claims was decided in a prior hearing on the franchisees' Motion for Summary Judgment.

7

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B). We are required to construe factual inferences that are reasonably drawn from the evidence presented in favor of the party opposing the motion; all doubt is to be resolved in the non-moving party's favor. *See Argonaut Great Cent. Ins. Co. v. Hammett*, 39,024 (La.App. 2 Cir. 11/17/04), 887 So.2d 704.

We also are to remain cognizant of the mover's and non-mover's burdens of proof. Although the burden of proof on a motion for summary judgment remains with the moving party, the mover's burden changes depending upon whether he or she will bear the burden of proof at trial on the matter that is the subject of the motion for summary judgment:

> [I]f he or she will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

La.Code Civ.P. art. 966(C)(2). Louisiana Code of Civil Procedure Article 967(B) states the following about the non-moving party's burden:

> B. When a motion for summary judgment is made and supported [by affidavits], an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.

8

We will apply these principles to the issues presented to determine whether any genuine issues of material fact continued to exist after the parties presented their evidence and testimony to the trial court and, consequently, whether Arch was entitled to this partial summary judgment as a matter of law.

**Timeliness of Insurance Policy Delivery and
Ambiguity of Executive Summary**

The franchisees' first argument for reversal of the partial summary judgment asserts the untimely delivery of the insurance policy, in violation of La.R.S. 22:634.[3] They contend that Arch's failure to timely deliver the policy deprived them of notice of the fact that the $1,000 deductibles would not apply in the event of a named storm. They also contend that their only notice of the policy's deductibles was set forth in an ambiguous Executive Summary. The initial question we face on review of this partial summary judgment, then, is whether the facts and evidence established that the policy was untimely delivered to the franchisees, and, if so, whether the Executive Summary, by default, should be relied upon for a determination of whether the named storm wind deductible applies.

We begin with the statutory mandate of La.R.S. 22:634, which provides that delivery of an insurance policy to an insured or a person entitled to receive it, is to take place "within a reasonable period of time after its issuance." The purpose of this law is to ensure that an insured is informed of the policy's contents. *La. Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250 (La.1993). According to the deposition testimony of Mr. Warde and Ms. Krause, the actual Arch policy was issued and delivered to Mr. Andrews at Wright & Percy in February 2003,

---

[3]The statute states, in relevant part, that: "A. Subject to the insurer's requirements as to payment of premium, every policy shall be delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance."

approximately four months after the policy's effective date of October 1, 2002. On October 14, 2002, after the hurricane struck, a binder was issued by Arch, confirming the attachment of coverage as of October 1, 2002, and setting forth a listing of policy coverages and deductibles. It is undisputed that prior to Hurricane Lili occurring on October 3, 2002, the Executive Summary of the policy was the only document provided to the franchisees that purported to reflect any of the proposed policy's terms.

However, we do not find that the policy's delivery date was unreasonable in light of the facts presented. The policy was delivered in February 2003, within weeks of it being issued. The pertinent issue is whether the four-month period that passed between the effective date of the policy and its delivery placed the franchisees at a disadvantage in terms of knowledge of the terms of their policy. We do not find this to have been the case.

The binder that was issued to the franchisees through their agent on October 14, 2002, provided sufficient notice of the disputed deductible provisions. The franchisees' agent, Mr. Andrews, was vested with the implied authority to do all of those things necessary or incidental to the agency assignment, including accepting delivery of the insurance policy for the franchisees. *See Broadway v. All-Star Ins. Corp.*, 285 So.2d 536 (La.1973). His acceptance of delivery of the insurance binder satisfied the requirement for reasonable delivery of the policy to the franchisees. *Id*.

The insurance binder by its nature, "serves as a temporary policy that is subject to the conditions of the policy contemplated and incorporates the terms of the policy to be issued . . . ." *Donaldson v. United Comm. Ins. Co.*, 98-1187 (La.App. 3 Cir. 2/10/99), 741 So.2d 676, 683, *writ denied*, 99-727 (La. 5/7/99), 740 So.2d 1285; *see also, Trascher v. Foster*, 559 So.2d 16 (La.App. 4 Cir.), *writ denied*, 563 So.2d

875 (La.1990). According to La.R.S. 22:631, it is "used to bind insurance temporarily pending the issuance of the policy." In this case, a policy was, in fact, issued in February 2003. Arch's binder stated that it expressly incorporated the terms of that policy. Consequently, when the binder was accepted by the franchisees through their agent on October 14, 2002, they also accepted the underlying insurance policy that was subsequently issued. *Trascher*, 559 So.2d 16.

Although we have found that the binder that was issued on October 14, 2002, served to provide timely notice of the disputed policy terms, we are mindful of the franchisees' argument that policy exclusions and limitations are not valid unless they are clearly communicated to the insured. *La. Maintenance*, 616 So.2d 1250. "[E]xclusions or limitations on coverage in a policy should be clearly communicated to the insured at the time of the issuance of the binder." *Sims v. Ins. Unlimited of West Monroe*, 28,234, p. 3 (La.App. 2 Cir. 2/28/96), 669 So.2d 709, 711, *writ denied*, 96-785 (La. 5/3/96), 672 So.2d 689. Otherwise, an insured will assume that the desired coverage exists. *Id.* However, we find that the binder was clear as to the application of the deductibles. It stated that the deductible of $1,000 per occurrence would apply *except* in three particular listed instances. The named storm wind deductible was one of the listed exceptions.

We note that the franchisees' attempt to focus on the Executive Summary as the source for the determination of the application of the named storm wind deductible is misplaced and unsupportable based on the facts presented in the record. The Executive Summary was prepared by the brokerage firm, RMS, as a *summary* of the coverages to be offered by the Arch policy. The intention that the Executive Summary was to only summarize the actual policy was expressly stated at the bottom of the Executive Summary. In this regard, it stated that the "coverages shown are

only intended to summarize the basic policy coverages and optional coverages . . . . subject to declarations, terms, conditions, and exclusions of the actual policy." Moreover, by self-definition, a summary is a comprehensive, non-detailed restatement. The facts in the record reveal that this Executive Summary was not presented to the franchisees as a temporary policy, intending to incorporate the terms of the actual policy, as a binder would. Although the Executive Summary happened to be the only document purporting to represent the policy's contents prior to the franchisees' losses, this does not negate the fact that a binder, intending to incorporate the terms of the actual policy, was in fact issued approximately two weeks after the policy was bound, in the weeks following damage caused by a hurricane to the region.

**Negligent Misrepresentation**

The franchisees also claim that the partial summary judgment was improper because the facts established that Arch, as RMS's principal, was liable for the negligent misrepresentations ultimately made by Wright & Percy to the franchisees. The chain of liability, according to the franchisees, is established because Brendan Henry, an RMS employee at the time, supplied the erroneous information to Mr. Andrews at Wright & Percy that was passed on to the franchisees. The franchisees claim that these negligent misrepresentations for which Arch, as principal, was proven to be responsible, deprived them of the opportunity to shop the market for another deductible. Therefore, Arch's motion for summary judgment should have been denied. We disagree. The facts established only that Wright & Percy through its employee, Mr. Andrews, made the disputed statements to the franchisees.

12

Representatives for each of the franchisees testified that after receiving the Executive Summary, they spoke with Mr. Andrews about the named storm wind deductible and questioned how it was to be applied, since that deductible was different from the wind deductible in their prior policy. Mr. Andrews also admitted through deposition testimony that he advised the franchisees that the named storm wind deductible would apply to total losses as opposed to total insured value as stated in the Executive Summary. Consequently, it is undisputed that Mr. Andrews orally advised the franchisees that the named storm wind deductible was intended to apply to their total losses as opposed to total insured values of each property.

Ms. Krause and Mr. Warde also both testified on behalf of RMS and Arch, respectively, that the named storm wind deductible was always intended to apply to the total insured value of each property, as evidenced *in writing* by the Executive Summary issued by RMS, Arch's binder, and the actual Arch policy that was ultimately issued. That being said, the record does not support the contention that Arch could be liable for the negligent misrepresentations as urged by the franchisees. There is also no need for us to reach the issue of whether RMS was acting as an agent for Arch or the purpose of establishing a chain of liability. We find this assignment of error, consequently, to be meritless.

**Total Insured Value**

The final basis asserted for the reversal of the partial summary judgment by the franchisees is that legal error was committed by the trial court when it found that the term "total insured value," included the value held by McDonald's in each franchise location. The franchisees focus on the Executive Summary to support this contention. They rely on the argument that the Executive Summary was ambiguous because it failed to define "total insured value," and, therefore, this ambiguity should

13

have been construed in their favor. If properly construed in their favor, they contend that total insured value, should have been defined as that which includes only the franchise owners' value in the property.

We have already found that the Executive Summary does not appropriately serve as the insuring document that should be analyzed for the interpretation of the named storm wind deductible. "Total insured value" is clearly defined in Endorsement 4 of the policy that was issued.

IV.

## CONCLUSION

The partial summary judgment granted in favor of Arch Insurance Company is affirmed. Costs of this appeal are assessed to MaClaff, Inc., University Partnership, Ambassador Partnership, Abnar, Inc., Wilburn Enterprises, L.L.C., and Terry Wilburn d/b/a Cat Enterprises.

**AFFIRMED.**