STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-505

COLLETTE JOSEY COVINGTON, ET AL.

VERSUS

MCNEESE STATE UNIVERSITY, ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2001-2355
HONORABLE WILFORD D. CARTER, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of John D. Saunders, James T. Genovese, and Chris J. Roy, Sr.[*], Judges.

GENOVESE, Judge, concurs in the result.

AFFIRMED.

James D. "Buddy" Coldwell
Attorney General
Adam L. Ortego, Jr.
Assistant Attorney General
One Lakeshore Dr., Suite 1200
Lake Charles, LA 70629
(337) 491-2880
Counsel for Defendants/Appellants:
McNeese State University
State of La., Board of Supervisors for University of La. System

---

[*]Honorable Chris J. Roy, Sr., participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Seth B. Hopkins**
**Attorney at Law**
**1318 Dowling St.**
**Houston, TX 77003**
**(337) 540-9120**
**Counsel for Plaintiffs/Appellees:**
**Collette Josey Covington**
**Jade Covington**

**SAUNDERS, Judge.**

This is case wherein a student filed suit under Title II of the Americans with Disabilities Act of 1990 (hereinafter "ADA") and comparable Louisiana laws against the university she was attending. The student alleged in her petition that she was injured while exiting a non-ADA compliant restroom located in the university's student union.

The student filed a motion for summary judgment on various issues, including whether she was discriminated against by the university. The trial court found that the university was not entitled to sovereign immunity under U.S. Const. amend. XI, that the plaintiff was disabled, and that the university discriminated against her.

The university appealed alleging four assignments of error. We affirm the trial court's ruling regarding the four assignments raised.

**FACTS AND PROCEDURAL HISTORY:**

On January 31, 2001, plaintiff, Collette Covington (hereinafter "Covington"), was a wheelchair-bound student at McNeese State University (hereinafter "McNeese") with a history of a seizure disorder. On that date, she attended class on campus in Farrar Hall. Covington then proceeded to the Holbrook Student Union (hereinafter "the Old Ranch"). There she was to meet at the designated location for her transportation provided by the Louisiana Vocational Rehabilitation Service.

While waiting, Covington needed to use the restroom and proceeded to go into the Old Ranch. The doorway to the restroom that Covington attempted to use, at its smallest point, measured 29 5/8 inches in width, while the standards for ADA compliance is 32 inches. Covington alleged that while she was able to enter into the restroom, she suffered the humiliation of urinating on herself while unsuccessfully trying to transport from her wheelchair through the narrow, non-complaint restroom

stall door. Covington alleged that she then was injured while trying to gain sufficient leverage to open the door to exit the restroom.

After lengthy discovery, it was admitted by McNeese that not a single women's restroom in the Old Ranch is ADA compliant. Further, McNeese admitted that it did not have a transition plan in writing as required by the ADA.

Covington filed a motion for summary judgment on a multitude of issues. The trial court found that Covington was entitled to a judgment as a matter of law on the following issues: (1) that McNeese was not immune from suit under U.S. Const. amend. XI; (2) that she was disabled as defined by the ADA; and (3) that McNeese discriminated against her. McNeese appealed, alleging four assignments of error.

**ASSIGNMENTS OF ERROR:**

1.  The Trial Court erred in applying an incorrect standard to find that there was no genuine issue of material fact as to whether McNeese discriminated against Covington.

2   The Trial Court erred in finding that there was no genuine issue of material fact as to whether McNeese is immune from Covington's ADA claim under Amendment XI to the United States Constitution.

3.  The Trial Court erred in finding that there was no genuine issue of material fact as to whether Covington qualified as disabled under the ADA.

4.  The Trial Court erred in finding that there was no genuine issue of material fact as to whether McNeese discriminated against Covington.

**ASSIGNMENT OF ERROR #1:**

McNeese claims that the trial court erred in applying an incorrect standard to find that there was no genuine issue of material fact as to whether it discriminated against Covington. We find that this is a moot assignment of error.

The applicable standard of review for an appellate court when reviewing a motion for summary judgment is that of de novo. A de novo review gives no weight

2

to the judgment of the trial court. If the applicable standard of review were that of manifest error, or the like, then any review by this court resulting in a finding that the trial court used the incorrect standard would require us to give no credence to the trial court's findings. This is something a de novo review already entails. As such, we will not address whether the trial court applied the correct standard. Rather, we will fully address what standard of review is applicable to the particular issues presented to us in McNeese's appeal.

This court, in *McClaff, Inc., et al. v. Arch Insurance Co., et al.*, 07-1182, pp. 7-8 (La.App. 3 Cir. 2/27/08), 978 So.2d 482, 487-88 (citations omitted), aptly addressed the standard of reviewing a motion for summary judgment on appeal when it stated the following:

> Appellate courts review summary judgments de novo, applying the same criteria that govern a trial court's determination of a motion for summary judgment. Louisiana's Code of Civil Procedure [Article 966 (B)] states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." We are required to construe factual inferences that are reasonably drawn from the evidence presented in favor of the party opposing the motion; all doubt is to be resolved in the non-moving party's favor.

> We also are to remain cognizant of the mover's and non-mover's burdens of proof. Although the burden of proof on a motion for summary judgment remains with the moving party, the mover's burden changes depending upon whether he or she will bear the burden of proof at trial on the matter that is the subject of the motion for summary judgment:

>> [I]f he or she will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse

3

party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

La.Code Civ.P. art. 966(C)(2).

Thus, in the case before us, Covington, as the movant, bears the burden of proof on the motion for summary judgment. What Covington's burden of proof is depends upon whether she has the burden of proof at trial on the particular matter that is the subject of the motion for summary judgment. Here, the matters before this court on appeal are: (1) whether, under the ADA, Covington is and was disabled on January 31, 2001, at the time when she was allegedly injured in an Old Ranch restroom located on McNeese's campus; (2) whether McNeese discriminated against Covington; and (3) whether McNeese is entitled to immunity from this suit under Amendment XI to the United States Constitution.

In the first two issues, Covington bears the burden of proof at trial. Thus, her burden of proof on these two matters in a motion for summary judgment is to show that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that [she] is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B).

However, McNeese bears the burden of proof at trial on the third issue, i.e. immunity, as it is an affirmative defense. Thus, Covington, as movant for the motion for summary judgment, but not being the party that must carry the burden of proof on that particular matter at trial, does not have a burden "to negate all essential elements of [McNeese's Amendment XI immunity] defense." La.Code Civ.P. art.

4

966(C)(2). Instead, Covington merely has "to point out to the court that there is an absence of factual support for one or more elements essential to [McNeese's] defense." *Id.* Assuming Covington does so, if McNeese "fails to produce factual support sufficient to establish that [it] will be able to satisfy [its] evidentiary burden of proof at trial, there is no genuine issue of material fact" and Covington would be entitled to summary judgment on that matter. *Id.*

**ASSIGNMENT OF ERROR #2:**

In this assignment, McNeese contends that the trial court erred in finding that there was no genuine issue of material fact as to whether it is immune from Covington's ADA claim under the Amendment XI to the United States Constitution. We find that McNeese's contention lacks merit.

McNeese bears the burden of proof at trial on this issue as it is an affirmative defense. Thus, Covington, as movant for the motion for summary judgment, but not being the party that must carry the burden of proof on that particular matter at trial, has "to point out to the court that there is an absence of factual support for one or more elements essential to [McNeese's] defense." La.Code Civ.P. art. 966(C)(2).

We find that Covington does so by pointing out that, under *Bennett-Nelson v. Louisiana Board of Regents*, 431 F.3d 448 (5th Cir. 2005), *cert. denied*, 547 U.S. 1098, 126 S.Ct. 1888 (2006), and *Pace v. Bogalusa City School Board*, 403 F.3d 272 (5th Cir.), *cert. denied*, 546 U.S. 933, 126 S.Ct. 416 (2005) McNeese has waived its Amendment XI sovereign immunity defense.

Thus, under La.Code Civ.P. art. 966(C)(2)*,* should McNeese fail "to produce factual support sufficient to establish that [it] will be able to satisfy [its] evidentiary burden of proof at trial, there is no genuine issue of material fact" and Covington is

5

entitled to summary judgment on that matter. We find that McNeese has failed to carry this burden.

United State Constitution Amendment XI provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens of any Foreign State." U.S. Const. amend. XI.

The United States Fifth Circuit Court of Appeals, in *Bennett-Nelson*, 431 F.3d at 451 (citations omitted), stated that "[t]here are two exceptions to the rule of sovereign immunity. First, a state may waive its immunity by consenting to suit. Second, Congress may abrogate state sovereign immunity pursuant to the enforcement power conferred by §5 of the Fourteenth Amendment."

In *Pace*, the United States Fifth Circuit Court of Appeals held that Louisiana waived its sovereign immunity defense from claims brought by students under the Rehabilitation Act and Individuals with Disabilities Education Act when it accepted federal education funds. The *Pace* court reasoned that this waiver also applied to Title II ADA claims when, as is the situation in the case before us, the claims are regarding architectural barriers. In reaching this conclusion, the United States Fifth Circuit stated:

> [W]hen ADA claims are directed at architectural barriers, as they are here, the rights and remedies are exactly the same as those provided under the Rehabilitation Act. This circuit, as well as others, has noted that, because the rights and remedies under both statutes are the same, case law interpreting one statute can be applied to the other. The implementing regulations for § 504 and Title II are, in all material respects, the same. For example, both statutes' implementing regulations prohibit similar types of discrimination. In addition, § 504 and Title II's regulations governing new construction and alterations are effectively the same. The two statutes are interpreted to provide the same exception: No covered entity is obligated to make a "fundamental alteration" in its programs. Finally, the remedies available under § 504

6

and Title II are one and the same. Specifically, § 203 of Title II states that "[t]he remedies, procedures, and rights set forth in section 505 of the Rehabilitation Act of 1973 [29 U.S.C. 794(a)] shall be the remedies, procedures, and rights this title provides to any person alleging discrimination on the basis of disability in violation of section 202 [of the ADA]." [42 U.S.C. § 12133.] Section 505(a)(2) of the Rehabilitation Act, in turn, states that the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 ... shall be available" for violations of § 504 [29 U.S.C. § 794(a)(2)]. Thus, in *Barnes v. Gorman*, [536 U.S. 181, 122 S.Ct. 2097 (2002)] the Supreme Court held that "the remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI" of the Civil Rights Act. [*Id*. at 185.] For all intents and purposes, therefore, the remedies available to [a plaintiff] under § 504 and Title II are the same. The sole difference between the statutes lies in their causation requirements. This difference is not implicated, however, where, as here, the challenge is to architectural barriers.

*Id*. at 287-89 (footnotes omitted.).

Thus, given this clear jurisprudence, this assignment of error raised by McNeese is completely without merit. McNeese is part of the University of Louisiana System, whose Board of Regents is created in Article VIII, § 6(A) of the Louisiana Constitution of 1974, and is part of the Louisiana Department of Education. Moreover, neither party questioned that McNeese was a "public entity" as defined in Title II of the ADA. As such, it is clear that McNeese has waived its U.S. Const. amend. XI immunity.

McNeese's sole "argument" against waiver is that "McNeese does not waive its right to immunity under the Eleventh Amendment." Other than that partial sentence in brief, McNeese has not discussed the waiver issue elsewhere in brief or in oral argument. Rather, McNeese focused its U.S. Const. amend. XI argument on whether Title II exceeds Congress' power under U.S. Const. amend. XIV, § 5. Given that we have found that McNeese has waived its U.S. Const. amend. XI immunity with respect to Title II of the ADA, much like the U.S. Fifth Circuit in *Bennett-*

*Nelson* and *Pace*, we will not address the issue of abrogation.

Accordingly, we find that Covington carried her initial burden of pointing out that there is no factual support for the notion that McNeese did not waive its Amendment XI immunity defense. We also find that McNeese has done nothing to show that it can prove that it did not waive this immunity. Therefore, we find that Covington is entitled to summary judgment on this issue and affirm the trial court's ruling.

**ASSIGNMENT OF ERROR #3:**

McNeese alleges that the trial court erred in finding that there was no genuine issue of material fact as to whether Covington was disabled as defined under the ADA at the time of the alleged incident. This allegation has no basis.

As we stated in Assignment of Error #1, the standard of review for matters determined by a motion for summary judgment is that of de novo. Accordingly, we will look to the record, giving no credence to any findings by the trial court, to determine whether Covington met her burden of proof.

Covington is both the movant and the party that bears the burden of proof on the matter before us in this assignment. Thus, under La.Code Civ.P. art. 966(B), Covington must demonstrate "that there is no genuine issue as to material fact, and that [she] is entitled to judgment as a matter of law" regarding whether she was disabled as defined under the ADA at the time of the alleged incident.

42 U.S.C.A. § 12102(2) defines disability as follows:

The term "disability" means, with respect to an individual --

> (A) a physical or mental impairment that substantially limits one
> or more of the major life activities of such individual;

> (B) a record of such impairment; or

(C) being regarded as having such an impairment.

Whether an individual is qualified under the ADA is made on a case-by-case basis. Thus, the name of a particular impairment diagnosed does not qualify one *per se*, rather, it is the effect of the named impairment on the individual's major life activity that determines if the ADA applies to the particular claimant. *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct.681 (2002). In *Toyota*, the United States Supreme Court discussed what an individual must show under subsection (A) in order to qualify. First, the claimant must prove that he or she has "a physical or mental impairment." *Id.* at 194. Second, the "[c]laimant[] also need[s] to demonstrate that the impairment limits a major life activity." *Id.* at 195. Third, a claimant must demonstrate "that the limitation on the major life activity is 'substantia[l].'" *Id.* (*quoting* 42 U.S.C. § 12102(2)(A)(1994 ed.)).

In helping to refine what is included in the definition of disability above, courts have looked to the guidelines of the Equal Employment Opportunity Commission. These guidelines, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404 (1986) (*citing Skidmore v. Swife & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164 (1944))

29 C.F.R. 1630.2, in pertinent part, states:

(h) Physical or mental impairment means:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(i) Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(j) Substantially limits --
    (1) The term substantially limits means:

    (i) Unable to perform a major life activity that the average person in the general population can perform; or

    (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

    (2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

    (i) The nature and severity of the impairment;

    (ii) The duration or expected duration of the impairment; and

    (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

Evidence in the record relevant to whether Covington was qualified as disabled under the ADA includes the medical records of Dr. Lynn E. Foret, the medical records and deposition of Dr. Fayez Shamieh, and the medical record from Christus St. Patrick Hospital labeled Functional Assessment Tool. We will give an overview of each in order to give the criteria used to make our decision.

Dr. Foret, an orthopaedic surgeon, performed two surgeries on Covington's knee, the first on May 15, 2000, the second on December 18, 2000. In Covington's May 15, 2000, medical records, it was noted in her preoperative diagnosis that she was experiencing knee pain, effusion, inability to flex, limping, knee giving way, and

10

knee locking. In the postoperative diagnosis, Covington was said to be a candidate for another procedure in four months if she had not improved. A second procedure was performed on December 18, 2000. The day after the first surgery, Covington was prescribed "Canadian crutches" and a walker.

Both the preoperative and postoperative diagnoses from the December 18, 2000, surgery denoted that Covington had difficulty walking. On December 20, 2000, Covington was prescribed a wheelchair by Dr. Foret. On January 16, 2001, Dr. Foret met with Covington for an office visit. The records indicate that Dr. Foret asked Covington to walk and exercise as much as possible. Records dated January 17, 2001, particularize that Covington discussed with Dr. Foret's office the option of her getting a powered wheelchair. Covington was then informed that Dr. Foret would rather her ambulate, but, if she could not walk, he would send a prescription for the wheelchair. Dr. Foret then prescribed a power wheelchair to Covington that same day. Finally, Covington saw Dr. Foret on January 29, 2001, wherein it was noted that she was recently prescribed a wheelchair to assist with ambulation around McNeese.

Dr. Fayez Shamieh, a neurologist, had seen Covington for a seizure disorder since 1991. Prior to the accident, Dr. Shamieh's records show that Covington had a history of problems with headache and episodes where she lost consciousness, would fall, and, at times, would blackout. Additionally, on February 22, 1999, Dr. Shamieh's records noted that Covington lost bladder control.

Post accident, Dr. Shamieh wrote letters wherein he stated that Covington had difficulty ambulating, and that he felt it was medically necessary for her to have a powered wheelchair because of frequent seizures and inability to use her left side. On January 11, 2002, Dr. Shamieh recorded that Covington complained of marked

11

memory disturbance and thought disturbance. Memory problems were again noted on January 9, 2003.

In his deposition, Dr. Shamieh stated that he had personally witnessed Covington's seizures, although he could not determine their cause. He also stated that he had been prescribing different types of medications in order to curb Covington's seizures, with some success. Finally, Dr. Shamieh stated that, prior to the accident, he had prescribed or requested transportation for Covington due to problems she had with mobility and seizures.

Lastly, there is the medical record from Christus St. Patrick Hospital, a Functional Assessment Tool, dated January 3, 2001. The results of that evaluation exhibit that Covington scored at the lowest functional level, Total Assistance or an inability to test, for each category in locomotion. Those categories are wheelchair/walking and stairs.

Given the above, we first find that no reasonable person could look to the evidence in the record and determine that Covington did not have a physical impairment on the date of the accident. Dr. Foret's records, coupled with the Functional Assessment Tool, clearly indicate that Covington's knee had a degenerative condition that affected her ability to physically move by using only her muscular and skeletal systems, i.e. her musculoskeletal system. Covington scored at a level that required total assistance in walking according to the Functional Assessment Tool, and Dr. Foret's records show that Covington needed a powered wheelchair in order to help her move around McNeese's campus.

Moreover, Dr. Shamieh's records also clearly denote that Covington's seizure disorder affected her musculoskeletal system. His deposition and records attest that Covington should not just use only her muscle and skeletal system to move, nor

should she use any assistive device other than a wheelchair, because doing so could lead to greater injuries should she have a seizure and fall. Further, Dr. Shamieh's records clearly indicate that Covington's seizure disorder also affected her neurological system in that she would black out, lose consciousness, and have some memory dysfunction.

As we have determined that Covington carried her burden of proof regarding whether she had an impairment, we must now look to ascertain whether she carried her burden to prove that either impairment limited a major life activity. Initially, we note that walking is a major life activity. *See* 29 C.F.R. 1630.2(i). Further, the evidence in the record compels us to find that Covington's physical impairments limit her walking and that an opposite finding is unreasonable.

Dr. Foret's records show that he prescribed Canadian crutches for Covington, a walker, a wheelchair, and, finally, a powered wheelchair due to her difficulty walking related to her musculoskeletal impairments. Further, Dr. Shamieh stated in his deposition that he prescribed transportation for Covington as a result of her decreased mobility related to seizures and an impairment of both her neurological and musculoskeletal systems.

Finally, we find that Covington has made the necessary showing that the only reasonable finding from the evidence is that her physical impairments limit her ability to walk substantially. First, we are to look to the nature and severity of the impairments. The evidence in the record related to her musculoskeletal impairment indicates that Covington had so much difficulty walking that she underwent two surgeries the previous year in order to attempt to help her with locomotion. Further, post surgeries, just one month before the alleged accident, she needed a wheelchair to assist her in ambulation around McNeese. Moreover, according to the records and

13

deposition of Dr. Shamieh, it was necessary for Covington to use a wheelchair for personal movement because she could have a seizure, a symptom of the physical limitation on her neurological system. Such a seizure, while using any of the other prescribed assistive devices, could result in a fall and, thus, exacerbate her physical condition.

Second, we are to look at the duration or expected duration of the impairments. All of the evidence in the record leads to the conclusion that Covington still has both impairments to this day. Finally, we are to look at the permanent or long term impact of or resulting from the impairment. Again, all evidence indicates that these two impairments will permanently impact Covington's ability to walk.

McNeese focused its argument that Covington did not fit under 42 U.S.C.A. § 12102(2)(A) by questioning Covington's credibility in the way of pointing out some inconsistencies in her answers to interrogatories versus her deposition, and her statements versus her statements recorded in her medical records. We find these "credibility issues" irrelevant to whether Covington was disabled under 42 U.S.C.A. § 12102(2)(A). Moreover, after the alleged incident, Dr. Shamieh's records clearly note that Covington, at times, suffers from memory dysfunction. And finally, we note that there was considerable time that had lapsed between the date of Covington's alleged injury, the date she answered the cited interrogatories, and the date that she gave her deposition.

Regardless, Covington clearly fits into either part (B) or (C) of 42 U.S.C.A. § 12102(2), that state:

The term "disability" means, with respect to an individual –

. . .

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

With respect to part (B), Covington has submitted medical records that indicate her impairments to her musculoskeletal and neurological systems. In response, McNeese merely attempted to discredit those records by pointing out that Dr. Foret encouraged Covington to walk as much as possible and that Dr. Shamieh could not find the exact cause of her seizure disorder.

First, encouraging a patient that struggles to walk to practice is common sense. Second, Dr. Shamieh testified in his deposition that failure to find a cause for seizures happens in roughly 10% of the cases he sees, and that he believed Covington did have a seizure disorder.

Further, in essence, McNeese's sole basis for not conceding that Covington has a record of her impairments is that Covington, prior to this alleged incident, endured two knee surgeries, walked with forearm crutches for over a year, used a wheelchair for a month, and continues to use a wheelchair to this day, all so that she could fake an injury and bring this suit. This is completely unfathomable, especially when one considers that for McNeese's concoction to have merit, with respect to the seizure disorder, Covington would have to have faked seizures since 1991 all the while fooling Dr. Shamieh. Moreover, this hypothesis is completely unsupported by any evidence in the record.

If this notion were not indefensible enough, with respect to part (C), "being regarded as having such impairment," McNeese's employee, Tim Delaney, Director of Services for Students with Disabilities, states in his deposition (emphasis added), the following:

Q     Tell me about your encounter with Collette. You said - -
A     I have a - - I've been - - our office has been moved three times, but at the time I was at Farrar Hall on the third floor. She had a class right down the hall, and she noticed that our - - office was

15

there, so she was just coming every so often to talk to me, and she said she was going through LRS, and at the time, probably about half my students were going through Louisiana Vocational Rehabilitation Services, LRS, and they would pay their tuition and things like that. And normally *if you're accepted by them, then you would be automatically be accepted through my office. Used to they would have the students bring a sheet from them saying that they were registered,* but she never did. But she'd talk to me, and she would ask me questions about just things *pertaining to her disability* and things like that, and *I always kept trying to get her to register with me*, and this is like in, I think, 2000. It was a semester before she got in the accident. I remember she had to have some kind of - - *I remember her disability*, something with her foot. She had to have some kind of surgery, and we just talked about that, you know, just about, I guess, surgery and things like that.

This testimony unmistakably reveals that Delaney, McNeese's employee who deals with disabled students daily, regarded Covington "as having such impairment." Yet, still, McNeese has the audacity to not only fight this issue at the trial level, but also to contest it on appeal. Had Covington brought an action for frivolous appeal on this particular issue, it would seem that this court would have granted such a request.

Accordingly, we find no genuine issue of material fact that precludes Covington from entitlement to a judgment that she was disabled as defined under the ADA on January 31, 2001. As such, we affirm the trial court's judgment granting Covington's motion for summary judgment on this particular issue.

**ASSIGNMENT OF ERROR #4:**

In this assignment of error, McNeese asserts that the trial court erred in finding that there was no genuine issue of material fact as to whether it discriminated against Covington. We do not agree.

Again, Covington is both the movant and the party that bears the burden of proof on the matter before us in this assignment. As before, we will conduct a de novo review to determine if Covington proved that "there is no genuine issue as to

16

material fact, and that [she] is entitled to judgment as a matter of law" regarding whether she was discriminated against by McNeese. La.Code Civ.P. art. 966(B).

Title II of the ADA prohibits discrimination in the provision of public services. "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. 12132.

What an entity must do in order to comply with the mandate of 42 U.S.C.A. 12132 differs between existing facilities and those that are either new or altered facilities. The United States Third Circuit, in *Kinney v. Yerusalim*, 9 F.3d 1067, 1071 (3rd Cir. 1993), *cert. denied*, 511 U.S. 1033, 114 S.Ct. 1545 (1994), expressed this distinction well when it stated:

> [T]he Department of Justice issued regulations maintaining the previously established distinction between existing facilities, which are covered by 28 C.F.R. 35.150 (1992), and new construction and alterations, which are covered by 28 C.F.R. 35.151 (1992). With limited exceptions, the regulations do not require public entities to retrofit existing facilities immediately and completely. Rather, a flexible concept of accessibility is employed, and entities are generally excused from making fundamental alterations to existing programs and bearing undue financial burdens. 28 C.F.R. 35.150(a) & (b) (1992). In contrast, the regulations concerning new construction and alterations are substantially more stringent. When a public entity independently decides to alter a facility, it "shall, to the maximum extent feasible, be altered in such a manner that the altered portion of the facility is readily accessible to and usable to individuals with disabilities." 28 C.F.R. 35.151(b)(1992). This obligation of accessibility for alterations does not allow for non-compliance based upon undue burden.

Thus, in order for Covington to carry her burden, she must show that McNeese is a public entity, that she is a qualified individual, that she was excluded from participation or denied the benefits of McNeese's services, programs, or activities, and that such exclusion or denial was because of her disability. *Parker v. Universidad de Puerto Rico*, 225 F.3d 1 (1st Cir. 2000); 42 U.S.C.A. 12132.

17

Neither McNeese nor Covington disputes that McNeese is a public entity as defined in 42 U.S.C.A. 12131.[**] Further, as we decided in Assignment of Error #2, Covington is a qualified individual under the ADA. Accordingly, we must first determine, after looking at the record as a whole, whether Covington was excluded from participation or denied benefits by McNeese. Second, if that determination is in the affirmative, we must then ascertain whether that exclusion or denial was due to Covington's disability.

As a prerequisite to finding if McNeese excluded or denied Covington services, etc., we have to identify whether the Old Ranch is an existing or altered facility. We exclude the possibility that the Old Ranch is a newly constructed facility given that neither party disputes that the Old Ranch was originally constructed in 1967, far prior to the enactment of the ADA on July 26, 1990.

Alteration is defined in 28 C.F.R. 35.151(b) (emphasis added) as the following:

> (b) Alteration. Each facility or part of a facility altered by, on behalf of, or for the use of a public entity *in a manner that affects or could affect the usability of the facility or part of the facility* shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992.

The *Kinney* court looked to Congress' deliberations about the parallel provision in Title III and found them helpful. Just as in Title II, Title III has a distinction for existing and altered facilities. The House Report states, "[t]he Committee intends.. . that the forms of discrimination prohibited by [Title II] be identical to those set out in applicable provisions of Titles I and III of this legislation." H.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 84 (1990), *reprinted in*

---

[**]42 U.S.C. 12131 defines "public entity," in pertinent part, as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government. . ."

1990 U.S.C.C.A.N. 267, 36. The United States Third Circuit, in *Kinney,* 9 F.3d at 1073 (emphasis added), stated that Congress, in those discussions:

> focused on the "primary function" of a facility. "Areas containing primary functions refers to those portions of a place of public accommodations where significant goods, services, facilities, privileges, advantages or accommodations are provided." H.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 112 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 486. For example, "the path of travel [,] . . . *bathrooms*, telephones, and drinking fountains [must be] . . . readily accessible to and usable by individuals with disabilities." *Id.* at 394.
>
> Thus, while Congress chose not to mandate full accessibility to existing facilities, it required that subsequent changes to a facility be undertaken in a non-discriminatory manner. *The use of such changes must be made available to all.*

In the case before us, three areas of the Old Ranch were changed subsequent to the ADA's enactment. Those changes were to the game room, to the cafeteria, and to a loft office. The trial court found that the cumulative effect of these modifications rendered the entire Old Ranch subject to the more stringent requirements of an altered facility under the ADA. We agree.

The game room of the Old Ranch was converted into a computer laboratory after the enactment of the ADA. The only reasonable conclusion that can be reached from this fact is that this transition from game room to computer laboratory changed the primary function or defining characteristic of that area in the Old Ranch. A game room entails the purpose of leisure. A computer laboratory has, at its root, an educational purpose.

McNeese argues that this portion of the Old Ranch was made readily accessible and usable by individuals with disabilities by installation of an automatic door and installation of two computers designed for use by the disabled. This argument is completely irrational. Simply put, it ignores Congress' clear desire cited above in House Report Number 485, wherein it indicated that, once a facility is altered, bathrooms must be accessible and usable by persons with disabilities in an

area where significant services are provided. Moreover, for McNeese to make this argument directly conflicts with its position expressed by its President, Dr. Robert Hebert, whose deposition has the following exchange:

Q       If you built a state-of-the-art computer lab and you put an electric door to get into it, would you think logically that you would have to have an A.D.A. compliant rest room somewhere around for the disabled people who are using the computer lab?

A       I would - - you know, I would think so but - - I would think so.

Accordingly, we conclude that the area of the Old Ranch where the computer laboratory now exists has been altered as defined in 28 C.F.R. 35.151(b). As such, at minimum, the area of the Old Ranch where the computer laboratory is located is subject to the more stringent compliance requirements of an altered facility under the ADA.

The changes to the cafeteria were not related to student usability nor did they affect the function of that area of the Old Ranch. Rather, the changes related to kitchen equipment and aesthetics. Prior to these renovations, this area of the Old Ranch was a cafeteria. Thus, that particular function of that area of the Old Ranch was not modified. However, if different types of food are now offered in the cafeteria than those that were offered before the changes, one could argue that the "use" of the newly offered foods must be made available to all. The record has no evidence regarding the type of food offered prior to and after the renovations, therefore, we cannot conclude that it would be unreasonable to find that the cafeteria area is still subject to the less stringent standard applicable to an existing facility as defined by the ADA. Further, one could also argue that enjoyment of the aesthetic changes in the cafeteria must also be made available to all. However, such an argument has not been presented to us, and we decline to make such a finding *sua sponte*.

The changes to a loft office also were not related to the function of that area

20

as the primary function of that area of the Old Ranch, office space, was not changed. However, the changes, along with some painting and flooring work, added a stairway for access. This directly affects the usability of this area by students. Accordingly, the only reasonable conclusion that can be reached by us is that the loft office area of the Old Ranch has been altered as defined in 28 C.F.R. 35.151(b). As such, use of the loft office must be made available to all.

Given the above, we conclude that the primary function of the Old Ranch has changed from a building to promote leisure to a building that is part of the fundamental goal of McNeese, education. Thus, it is quite clear to this court that the Old Ranch has been altered for the use of McNeese's students in a manner that affects the usability of Old Ranch and that those alterations commenced after January 26, 1992. Accordingly, we are compelled to find that the Old Ranch, in its entirety, has been altered under 28 C.F.R. 35.151(b).

McNeese's argument against its responsibility of making a single women's bathroom in the Old Ranch ADA compliant is, first, that use of the Old Ranch was not part of its fundamental goal, education of its students. In deposition, Dr. Robert Hebert, President of McNeese, stated:

> A.  Whether or not it's fundamental for them to get into that student union annex or that it's fundamentally important for them to obtain an education, I would question that. I'm not sure I would regard it as a high priority.
>
> . . . .
>
> All I'm saying is it's a priority issue. It's what - - we're trying to address those things that are fundamental to the role of the institution, make sure the students have a chance to receive an education and I don't think that going into the student union is fundamental.

This testimony makes it clear that Dr. Hebert thought the fundamental role of McNeese was to give students a chance for an education, but that he did not consider

21

the Old Ranch, or anything located in it, necessary for McNeese to achieve its goal. This position must fall as it is clear that the primary function of a computer laboratory is to further and enhance one's education. As such, any contention that meaningful access to the Old Ranch, especially the computer lab, is not part of the fundamental mission of McNeese is indefensible.

Second, McNeese claims that the Old Ranch is an "existing facility" under the ADA. McNeese cites the cases of *Ass'n for Disabled Americans v. City of Orlando*, 153 F.Supp.2d 1310 (M.D.Fla. 2001) and *Durante v. County of Belknap, New Hampshire*, 2005 W.L. 361450 (D.N.H. 2005)*** for its contention that the Old Ranch should not be considered an altered facility. In *Orlando*, the federal court for the Middle District of Florida held that two facilities, the Bob Carr Performing Arts Centre ("the Bob Carr") and the Orlando Arena, were not altered as defined by the ADA. The *Orlando* case is readily distinguishable from the case before us. The *Orlando* court, when discussing the changes to the Bob Carr, stated the following:

> [A]ll of the alterations made to the public areas of [the Bob Carr] since 1992 were made in an effort to make the building more accessible to disabled individuals. Mr. Becker testified that the restrooms were renovated to add accessible stalls in 1992. In 1993, the seating in the theater was modified to increase the number of wheelchair accessible seats. In 1994, an additional accessible restroom was added adjacent to Row JJ of the theater. Each of these alterations appears to have affected the "usability" of the theater; however, the end result of those alterations was to make the facilities more accessible to disabled individuals. To the extent that an obligation to make the facilities more accessible was triggered by those alterations, the Court finds that the obligation was met.

*Orlando*, 153 F.Supp.2d at 1319.

Unlike the City of Orlando's changes it made to the Bob Carr, the modifications that McNeese made to the Old Ranch clearly were not to make the building more accessible to individuals with disabilities. Adding a stairway surely

---

***Durante* was not for publication and was not published in F.Supp.2d.

does not qualify as making a building more accessible to the disabled, nor does making a cafeteria more pleasing aesthetically or more functional in preparation of food. Additionally, while the transformation of the game room into a computer laboratory did include an electric door and handicap accessible computers for the benefit of disabled individuals, it did not make anything more accessible to those persons so much as it completely changed the primary function of the area like the *Kinney* case cited by Covington. Further, one has to question how accessible a computer laboratory is, even with an electric door and accessible computers, given that there is not a single women's handicap accessible bathroom in the entire building that houses it.

With regard to the Orlando Arena, the *Orlando* court stated the following:

> Becket testified that the only extensive alteration made to publically accessible areas of the Arena was the replacement and addition of seats in the upper and lower bowls. . . . Though the replacement of seats was arguably an alteration affecting the usability of the Arena, the Court does not believe that it presented an opportunity to add or modify accessible seating. The presence of stairs in both the upper and lower bowls of the Arena would seemingly make it impossible for individuals in wheelchairs to sit in those areas. Because Plaintiffs did not present expert testimony at trial, the Court has no way of knowing whether modification to those areas was even structurally possible. It appears, however, that the stepped nature of the Arena makes the dispersal of accessible seating "technically infeasible." *See* 28 C.F.R., Pt. 36, App. A. § 4.1.6(1)(j). It is, therefore, permissible for the accessible seating areas to be clustered, as they are in the Arena. *See* 28 C.F.R., Pt. 36, App. A. § 4.1.6(3)(f).

*Orlando*, 153 F.Supp.2d at 1319.

Again, this is not the scenario presented in the case before us. Surely making a single women's bathroom accessible in the Old Ranch was structurally possible and, thus, not "technically infeasible."

Another reason presented by McNeese as to why it did not modify a single women's restroom was due to a lack of funds. First, given that we have found that

23

the Old Ranch was an altered facility, this defense is not available to McNeese. *See Kinney*, 9 F.3d at1074, wherein the court stated:

> "While the integration of people with disabilities will sometimes involve substantial short-term burdens, both financial and administrative, the long-range effects of integration will benefit society as a whole." H.Rep. No. 485, 101st Cong., 2d Sess., pt. 3, at 50 (1990) *reprinted in* 1990 U.S.C.C.A.M. 445, 473. Balancing these interests, Congress acknowledged the existence of an undue burden defense for existing facilities but clearly warned, "[n]o other limitation should be implied in other areas." *Id*.

Second, this defense is absurd given that the cost of making a single women's bathroom in the Old Ranch ADA compliant is minimal according to both common sense and evidence in the record, namely the "Smith Report." This report was produced by McNeese in response to Covington's Request for Production. It contained a list of needs, in order of priority, for McNeese to improve accessibility for disabled students. The first priority listed was "the bathroom facilities in all buildings." Next to this first priority, a range of dollar amounts was listed as "$7,000 min - $91,000 max." The only reasonable conclusion from this evidence is that the cost of making every bathroom facility in all buildings ADA complaint would fall in that range. Here, McNeese is trying to excuse its failure to make a single women's bathroom ADA compliant based on lack of funds when it has admitted, via deposition of Dr. Hebert and its Building Use Fund budgets, that it has funds available that are greatly in excess of the maximum $91,000 estimation in the Smith Report.

The second case McNeese cited is *Durante*, 2005 W.L. 361450. It is incomprehensible to this court how McNeese can declare that this case helps their position. The plaintiff in *Durante* was a visually impaired individual who claimed that a county in New Hampshire did not make its courthouse readily accessible to him. He claimed so because his guide dog led him to an entrance of the courthouse

24

that was locked. That entrance had a sign that pointed the plaintiff to an entrance that was accessible to him. When the guide dog attempted to lead Durante in the direction of that entrance, the plaintiff was injured when he walked into a tree branch. The court in *Durante* looked to the building as a whole and found that it was ADA compliant because, "[h]ere, there is no dispute that the courthouse has *at least one* entrance that is accessible to individuals with disabilities, including those with visual impairments." *Id*. at 3 (Emphasis added.) Ironically, here, there is no dispute between the parties that there is not "at least one" ADA complaint women's bathroom in the entire Old Ranch. Plainly, the cases McNeese cites have no weight in the view of this court, as they are either easily distinguishable and/or actually hinder McNeese's position.

Finally, even if the Old Ranch were an "existing facility" under the ADA, it still would not be compliant. As we have stated, what McNeese must do in order to comply with the mandate of 42 U.S.C.A. 12132 differs between existing facilities and those that are either new or altered facilities.

Under 28 C.F.R. 35.150(a), "A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." This duty is limited in 28 C.F.R. 35.150(a)(3)(emphasis added) wherein the following is stated:

> [28 C.F.R. 35.150(a) does not]

> (3) Require a public entity to take any action that it can demonstrate would result in a *fundamental alteration* in the nature of a service, program, or activity or in *undue financial and administrative burdens*. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens. The

decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.

Thus, under this particular regulation, McNeese needs to prove that compliance with the ADA in the Old Ranch would present a fundamental alteration or undue financial burden. As we have addressed above, there is no evidence in the record to support the defense of financial burden. Further, the regulations clearly state that McNeese would have the burden of proving these defenses, and it has produced no evidence that compliance would result in a fundamental alteration of its services, etc., or undue administrative burdens. Therefore, even if the Old Ranch were an existing facility, McNeese failed to show that it complies with the ADA in that regard.

McNeese claims that the Old Ranch is compliant under 28 C.F.R. 35.150(b)(1) via "other methods." The methods that can be used to meet the duty imposed on existing facilities in 28 C.F.R. 35.150(a) are delineated in 28 C.F.R. 35.150(b)(1), which states the following:

(b) Methods--

(1) General. A public entity may comply with the requirements of this section through such means as redesign of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section.

> A public entity, in making alterations to existing buildings, shall meet the accessibility requirements of §35.151. In choosing among available methods for meeting the requirements of this section, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate.

McNeese argues that it uses "other methods" to accommodate its disabled students under 28 C.F.R. 35.150(b)(1). First, McNeese claims that Covington should have registered with Tim Delaney's office so that it could have assigned an aid to her. McNeese has conceded in brief that Covington did not have to register with Delaney's office by law, but also states it is logically necessary for her to register in order for its "other method" to be utilized, an assignment of an aid to Covington to help transfer her from her chair to the toilet and back.

In *Matthews v. Jefferson*, 29 F.Supp.2d 525, 533 (W.D.Ark. 1998), the Arkansas Western District Court stated:

> "[C]arrying an individual with a disability is considered ineffective and therefore an unacceptable method for achieving program accessibility." Appendix A to 28 C.F.R. 35.150(b)(1). Carrying is permitted only in manifestly exceptional cases, and only if all personnel who are permitted to participate in carrying an individual with a disability are formally instructed on the safest and least humiliating means of carrying. "Manifestly exceptional" cases in which carrying would be permitted might include, for example, programs conducted in unique facilities, such as an oceanographic vessel, for which structural changes and devices necessary to adapt the facility for use by individuals with mobility impairments are unavailable or prohibitively expensive. Carrying is not permitted as an alternative to structural modifications such as installation of a ramp or a chairlift.
> *Id.*

McNeese has the burden of proving that this "other method" is effective. *See Chaffin v. Kansas State Fair Board*, 348 F.3d 850 (10th Cir. 2003). McNeese has provided no evidence that this "other method" is effective. Quite the contrary, it is apparent that this "other method" failed Covington in the case before us.

Moreover, in *Parker*, 225 F.3d at 6 (citations omitted), the United States First

27

Circuit Court of Appeals stated, "Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available."

Given these relevant regulations, if the Old Ranch were an existing facility, McNeese would be "obligated to ensure that each service, program or activity" available in the Old Ranch was accessible to disabled individuals. *Id*. It has not done so.

In *Parker*, a guest at a public university suffered an injury when his wheelchair tipped over as he was attempting to enter a campus botanical garden. The United States First Circuit held that the university discriminated against the disabled guest because, "[a]lthough the University is not required to make every passageway in and out of the Monet Garden accessible, it must provide *at least one* route that a person in a wheelchair can use to reach the Monet Garden safely, absent a defense that excuses such performance."*Id*. at 7. (Emphasis added.)

Here, under the reasoning in *Parker*, McNeese's argument would still fail as it did not provide "at least one" ADA compliant women's bathroom. Thus, even if we had not found the Old Ranch to be an altered facility, it still would not be ADA compliant as an "existing facility."

After having reached the conclusion that the Old Ranch is an altered facility, we turn our attention to whether Covington has carried her burden in proving that she was "excluded from participation in or be denied the benefits of the services, programs, or activities of" McNeese under 42 U.S.C.A. 12132. We find that Covington has carried that burden.

McNeese has judicially admitted that the bathroom in the Old Ranch where

the alleged incident occurred violates the ADA in the following:

**REQUEST FOR ADMISSION NO. 4:**
Please admit or deny that the Old Ranch women's restroom where the accident which forms the basis of this suit occurred does not meet the requirements of the Accessibility Guidelines promulgated by the U.S. Attorney General for restroom doors.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**
Admit.

Further, McNeese has judicially admitted that no women's bathroom in the Old Ranch met ADA standards in the following:

**REQUEST FOR ADMISSION NO. 15:**
Please admit or deny that in January 2001, no women's restroom in the Old Ranch met the Accessibility Guidelines promulgated by the U.S. Attorney General for restroom doors.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**
Admit.

We have already found that the Old Ranch is an altered facility, especially noting the change of its "primary function" due to the installation of a computer laboratory. As an altered facility whose primary function has changed, Congress stated in H.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 394 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445 (emphasis added) that "the path of travel. . . *bathrooms*, telephones and drinking fountains. . .[be] readily accessible to, and usable by, individuals with disabilities."

It is clear that McNeese has failed to heed Congress' direction in this regard. As such, it is not reasonably contestable that Covington was denied the benefits and services of the computer laboratory or anything else located in the Old Ranch.

Finally, Covington must prove that she was discriminated against because of her disability. We find that she has done so, unequivocally.

McNeese has judicially admitted that the bathroom Covington was exiting when she was allegedly injured had an opening of 29 5/8 inches. ADA Accessibility

Guidelines for Buildings and Facilities § 4.13.5 states, "Clear Width. Doorways shall have a minimum clear opening of 32 in (815 mm) with the door open 90 degrees, measured between the face of the door and the opposite stop." This standard applies to the bathroom at issue. It is plain that McNeese has discriminated against those disabled individuals who require the 32 inch width in a doorway in order to use this restroom in the Old Ranch.

This minimal width standard of 32 inches is such so that persons in wheelchairs can have access to bathrooms or any rooms they wish to enter or exit. Covington's disability on the date of the alleged incident, her inability to walk, and her seizure disorder required that she use a wheelchair to ambulate around campus. Therefore, McNeese's refusal to widen the doorway for this bathroom, nor make any women's bathroom in the Old Ranch ADA complaint, discriminated directly against Covington due to her disability.

Accordingly, we find that Covington has carried her burden of proving that there was no genuine issue of material fact as to whether McNeese discriminated against her and that she is entitled to a judgment as a matter of law on this issue. As such, we affirm the trial court's judgment in this regard.

As an aside, this court notes in deposition, Tim Delaney, Director of Services for Students with Disabilities at McNeese, stated:

> We have two computers that really nobody uses, but if somebody comes in with a disability who wants to use, it's totally - - it has everything imaginable, you know, that's out there. A lot of people probably look at it like it's a waste because, you know, everything turns obsolete in like a year or two, and we probably have maybe once or twice a year a student use it, but it's there.

This court does not find this observation surprising, nor apparently did Dr. Hebert in his deposition, given that any student whose disability would require her to use one of those two computers would likely be in a wheelchair, and the Old

30

Ranch lacks a single women's restroom that is ADA complaint in the entire building.

We cannot fathom that McNeese felt no need, regardless of whether it was required by law, to upgrade a single women's restroom into ADA compliance in a building that houses, *inter alia*, the two main student cafeterias on campus, offices for student government and activities, and a state-of-the-art computer laboratory. McNeese's decision to ignore a federal mandate is reminiscent of the intolerance of the past. We had hoped that the days where a court has to step in to ensure that people were treated equally under the laws of this country were gone. Yet, still, McNeese is emboldened enough to bring such a case to an appellate court where a published, written opinion will forever memorialize its discrimination against this country's disabled citizens. It is hoped that McNeese will reassess its attitude toward its disabled students. It is also hoped that McNeese will prepare and publish a transition plan as required by the ADA.

**CONCLUSION:**

McNeese raised four assignments of error. We have found that each of the four assignments lack merit. Therefore, we affirm the trial court in its finding that Covington is entitled to a summary judgment that McNeese is not immune under the Amendment XI of the United States Constitution, that she is disabled under the ADA, and that McNeese discriminated against her under Title II of the ADA. McNeese is cast with all costs of these proceedings.

**AFFIRMED.**